| | |
|---|---|
| | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OFARIZONA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | **No. CR 08-1253-TUC-FRZ (CRP)** |
| ) | |
| **vs.** ) | |
| ) | **REPORT AND RECOMMENDATION** |
| ) | |
| **ROHAN S COOMBS,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

Defendant brings two motions, requesting the Court suppress evidence discovered as a result of a traffic stop and statements Defendant made subsequent to the stop. (Docs 20, 21). The Government contests both of Defendant's motions, arguing the officer had probable cause that a traffic violation occurred to stop Defendant's truck and that Defendant was not in custody when he made statements to officers. (Docs 43, 44). The Magistrate Judge heard oral argument on the motions on September 17, 2009. (Doc 51). It is the report and recommendation of the Magistrate Judge that the District Court, after its independent review, deny Defendant's motion to suppress evidence and deny in part and grant in part Defendant's motion to suppress statements.

**FACTUAL FINDINGS**

At the evidentiary hearing, the Government presented the testimony of two Arizona Department of Public Safety ("DPS") officers and one Drug Enforcement Agency ("DEA") agent. The first DPS officer, Officer William Hahs, testified as to a regulatory stop he conducted on Defendant's commercial truck on September 9, 2008. The second DPS officer, Officer Charles Galarneau, testified as to a traffic stop of Defendant's vehicle on September 12, 2008. DEA Agent Mark Henson testified as to the investigation of Defendant from the first stop through the second stop when a search of Defendant's truck revealed several bundles of marijuana.

Defendant's commercial truck was originally stopped by Officer Hahs outside of Benson, Arizona for a routine inspection of Defendant's commercial truck paperwork. (Doc 51, Evidentiary Hearing Transcript from 9/17/2009 ("TR"), p 8). Officer Hahs is a commercial vehicle inspector and as part of his duties he conducts inspections of drivers and their vehicles. (TR, p 6-7). Inspecting Defendant's paperwork, Officer Hahs asked Defendant to provide him with his license, medical card, logbook, and manifest. (TR, p 8).

In reviewing Defendant's paperwork and talking with Defendant and his passenger, several observations made Officer Hahs suspicious of Defendant's activities. (TR, p 14). First, Defendant told Officer Hahs that he drove some furniture from Florida to Houston, Texas for a friend without being paid. (TR, p 10). Second, when Officer Hahs stopped Defendant outside of Benson, Arizona, Defendant was driving "empty", without cargo, from Houston hoping to find a paying load in Arizona. (TR, pp 14-15). Also, Defendant's logbook, which is supposed to reflect his "in service" and "out of service" time, had inaccuracies and violations. (TR, pp 11, 13, 14).

For the logbook violations, Officer Hahs placed Defendant "out of service" for ten consecutive hours and accompanied Defendant and truck to a nearby truck stop. (TR, p 14). Officer Hahs then contacted a narcotics DPS officer and relayed his suspicions about Defendant. (TR, p 14). The DPS narcotics officer contacted DEA, and surveillance was begun on Defendant's truck. (TR, pp 23-24).

As part of the surveillance, DEA agents, including Agent Henson, met narcotics DPS officers at the truck stop where Defendant's truck was still parked "out of service" as part of its ten hour penalty. (TR, p 25). DPS narcotics officers approached Defendant's truck, initiated contact, and asked for permission to search the truck, which Defendant denied. (TR, pp 25-26). DPS officers then ran a canine drug detection dog around the perimeter of Defendant's truck and eventually obtained a search warrant for the truck. (TR, pp 25-26). No contraband was located during the search. (TR, p 27). DEA agents were not involved in the search of Defendant's truck but they did place a GPS tracker on Defendant's truck during the search. (TR, p 28). The GPS tracker device was a five to six inch box with four magnets on the outside case. (TR, p 28). The device is designed to be placed on the external portion of a vehicle. (TR, p 28). Defendant did not appear to know the tracker was placed on his vehicle. (TR, p 29).

Using the GPS tracker, DEA agents tracked the truck's movement from the afternoon of September 9, 2008 through the evening of September 12, 2008, when DPS Officer Hahs initiated a traffic stop of Defendant. (TR, p 32). During that time Defendant's truck traveled through Los Angeles, up to Lompoc, California, back through Los Angeles and into Avondale, Arizona outside of Phoenix. (TR, p 32). In Avondale, DPS officers established surveillance and observed the trailer backed up to an open-air warehouse. (TR, p 33). At some point on September 12, 2008, the tractor portion of the truck reattached the trailer from the warehouse and the truck entered I-10, headed toward Tucson. (TR, p 33).

On the morning of September 12, 2008, DPS Officer Galarneau attended a briefing at the DEA office in Sierra Vista regarding Defendant. (TR, pp 54). Officer Galarneau is a canine handler and his canine travels with him while he is on duty. (TR, pp 53, 71). At the briefing, Officer Galarneau was told that Defendant's truck was suspected of being involved in criminal activity and that if Officer Galarneau saw the truck, he should develop his own probable cause to stop the truck. (TR, pp 55, 71).

That night around 10:50 p.m., Officer Galarneau was waiting for Defendant's truck to pass by him as he was parked in the median of I-10 near milepost 296. (TR, p 71). DEA

1  Agent Henson called Officer Galarneau on his cell phone to alert him that Defendant was in
2  Officer Galarneau's area. (TR, p 72). As Defendant's truck passed by, Officer Galarneau
3  pulled in behind him. (TR, p 72). Officer Galarneau followed Defendant's truck for
4  approximately two to three miles before initiating a stop. (TR, p 73). Officer Galarneau
5  testified that he observed the truck cross over the fog line and strike the rumble strips four
6  times in a half mile stretch. (TR, pp 56, 73). Based on his observations that Defendant
7  violated Arizona lane usage law, Officer Galarneau initiated a stop of the truck. (TR, p 76).

When Officer Galarneau activated his lights to initiate the stop of Defendant's truck, his "Dash Cam", the camera inside Officer Galarneau's patrol vehicle, began to record video. (TR, p 74). The camera did not record the traffic violation. (TR, p 74). The video of the traffic stop was submitted as Government's Exhibit 105.

Defendant pulled his truck over to the side of the road and the video shows that Defendant came to the back of his truck and answered Officer Galarneau's questions. (TR, p 58; Exhibit 105, 22:50:13). Officer Galarneau asked for Defendant's logbook and vehicle registration. (TR, p 58). All of Defendant's paperwork was left in the cab of his truck and Defendant allowed another DPS officer on the scene to retrieve various papers from the cab of his truck multiple times. (TR, p 58, Exhibit 105). On the video, Defendant told Officer Galarneau that he picked up a load in Los Angeles and was driving the I-10 to deliver the load in Connecticut. (TR, p 59; Exhibit 105). When Officer Galarneau commented to Defendant that the route was an odd choice given that the I-40 would be a more direct route, Defendant went into an explanation about the I-10 route saving him fuel because of fewer hills even though it was a longer distance. (TR, p 59; Exhibit 105). Officer Galarneau did note inaccuracies in Defendant's logbook and warned Defendant for the lane violation. (Exhibit 105).

After Officer Galarneau gave Defendant back all his paperwork and the warning, Defendant waited to retrieve his pistol. (TR, 58; Exhibit 105). Officer Galarneau told Defendant he could have the pistol when he got back in the cab of his truck. (Exhibit 105, 23:07:40). While Defendant was still standing at the front of the patrol vehicle, Officer

Galarneau asked Defendant if he had any contraband in the truck. (Exhibit 105, 23:07:45). Defendant answered no. (Exhibit 105). At that point, Defendant had been detained by DPS officers for approximately nineteen minutes. (Exhibit 105, 22:48 - 23:07). Officer Galarneau then told Defendant that he had a canine and asked if he could search Defendant's truck with the canine. (Exhibit 105). Defendant answered yes and Officer Galarneau then asked Defendant to sign a consent to search form. (Exhibit 105). The video shows Defendant quickly glanced at the form and signed it. (Exhibit 105, 23:08:16). Officer Galarneau asked Defendant if he read it and if he understood everything. (Exhibit 105, 23:08:30). Defendant then read the form for a longer period of time and told Officer Galarneau that he did understand it. (Exhibit 105).

Officer Galarneau proceeded to walk around Defendant's truck and then walk his canine around the truck. (Exhibit 105). Officer Galarneau testified that the canine alerted to the back trailer doors. (TR, p 63). After the canine alerted, Defendant was placed in the back of a patrol car. (Exhibit 105). Officer Galarneau told him he was being held in an investigatory detention. (Exhibit 105, 23:44). It was approximately 11:23 p.m. at that point. Officer Galarneau then proceeds to tell Defendant that Defendant is doing many "illegal things" and he questions Defendant about some of the inconsistencies in Defendant's story. (Exhibit 105, 23:44). Defendant was not advised of his *Miranda* rights until approximately 1:20 a.m. (Exhibit 103, p 5). After he was *Mirandized*, Defendant stated he did not wish to answer any questions. (Exhibit 103, p 5).

After the canine alerted to Defendant's truck, DPS officers and DEA agents worked to find someone who could drive Defendant's commercial truck to a safer location in order to search it. The time between the initial stop and the moving of Defendant's truck was approximately an hour and twenty-one minutes. (Exhibit 105, 22:48 - 00:09). Defendant's truck was searched in a Wal-Mart parking lot and the search revealed sixty-three bundles of marijuana. (Exhibit 103, p 5).

**MOTION TO SUPPRESS EVIDENCE**

Defendant argues (1) the DEA's installation of a GPS tracking device on Defendant's

1 truck was a seizure and the Government lacked reasonable suspicion to place it; (2) the stop
2 of Defendant's truck lacked reasonable suspicion; and (3) Defendant's consent to search the
3 truck was not valid. Government responds (1) under Ninth Circuit precedent, the placement
4 of a GPS tracking device on Defendant's truck was not an illegal search or seizure; (2) the
5 DPS officer had probable cause to believe Defendant committed a traffic violation before the
6 officer initiated the stop; and (3) Defendant's consent to search the truck was valid and
7 voluntary.

Under Ninth Circuit precedent, the placement of a magnetized electronic tracking device on the undercarriage of a vehicle in not an illegal search or seizure. *United States v. McIver*, 186 F.3d 1119, 1126-1127 (9th Cir.1999). There is no expectation of privacy in the exterior of a car because "[t]he exterior of a car, of course, is thrust into the public eye, and thus to examine it does not constitute a 'search'." *New York v. Class*, 475 U.S. 106, 107 (1986). The placement of a tracking device on the undercarriage of a vehicle is also not a seizure. "A seizure of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Karo*, 468 U.S. 705, 712-713 (1984) (internal citation omitted). In *McIver*, the placement of a magnetized tracking device did not deprive the defendant of "dominion and control" of his vehicle and therefore, the Ninth Circuit concluded that no seizure occurred. 186 F.3d at 1127.

Like the defendant in *McIver*, Defendant in this case had no reasonable expectation of privacy in the exterior of his truck including the undercarriage where the GPS tracking device was placed. No evidence was presented that Defendant had any intention of protecting this section of his truck from the public eye. Furthermore, the device did not deprive Defendant of dominion and control over his truck. The device, as described by DEA Agent Henson, is a five to six inch box with four magnets on the outside case and it is designed to be placed on the external portion of a vehicle. The DEA agent in this case placed the device on the frame of Defendant's tractor. No evidence was presented that the tracking device damaged or interfered with Defendant's truck or his control over it. The GPS tracking device did not violate Defendant's Fourth Amendment rights and the Magistrate Judge

recommends that this portion of the motion to suppress evidence be denied.

Defendant also contends DPS officers lacked reasonable suspicion to stop his truck. The Government maintains DPS Officer Galarneau stopped Defendant's truck because the officer had probable cause to believe Defendant committed a traffic violation. The United States Supreme Court has held "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). Such a stop is reasonable even if the officer has other motivations for initiating the stop. *United States v. Diaz-Castaneda*, 494 F.3d 1146, 1152 (9th Cir.2007).

Officer Galarneau testified that he observed Defendant's truck cross over the fog line and strike the rumble strips four times in a half mile stretch. This was in violation of Arizona law, which requires a person "drive a vehicle as nearly as practicable entirely within a single lane and shall not move the vehicle from that lane until the driver has first ascertained that the movement can be made with safety." A.R.S. § 28-729(1). Defense counsel argued Officer Galarneau's purpose for stopping Defendant's truck was to search for possible narcotics given Officer Galarneau's briefing with the DEA that morning. Officer Galarneau's subjective intent does not play a role in the probable-cause Fourth Amendment analysis. *Diaz-Castaneda*, 494 F.3d at 1152. The issue is whether Defendant's truck crossed the rumble strip such that Defendant violated Arizona traffic law. Officer Galarneau testified that he observed the truck cross the rumble strips and Defendant did not present any evidence to contradict that testimony. The officer had probable cause to stop Defendant's truck and the Magistrate Judge recommends that Defendant's motion to suppress evidence be denied with respect to this argument.

Defendant argues that his consent to search the truck was not valid. Defendant first contends the consent was not valid because it was obtained during an unlawful detention. As discussed supra, Officer Galarneau initiated a lawful traffic stop of Defendant's truck. The brief detention of Defendant was not a constitutional violation.

Defendant next argues Officer Galarneau prolonged his detention and asked for

consent to search the truck after the traffic stop concluded. A traffic stop "that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). If, however, police questioning occurs during a traffic stop and does not prolong the detention of an individual, reasonable suspicion is not required to justify questioning outside the scope of the justification for the traffic stop. *United States v. Mendez*, 476 F.3d 1077, 1080 (9th Cir.2007) (applying principle outlined by Supreme Court in *Muehler v. Mena*, 544 U.S. 93, 101 (2005) that police questioning can be outside the scope of the justification for the stop).

In the case before this Court, Defendant was detained for approximately nineteen minutes before Officer Galarneau asked for consent to search his truck. Nineteen minutes is not an unreasonable amount of time to conduct a traffic stop on a commercial truck, which involved retrieving and reviewing Defendant's logbook. Furthermore, the traffic stop was not concluded when Officer Galarneau asked Defendant for consent to search his truck. Defendant is correct, Officer Galarneau had already issued a warning for the lane change violation but Defendant was still conversing with Officer Galarneau and still waiting for the officers to return his gun. The stop was not a prolonged detention of Defendant and Officer Galarneau requested consent to search while the stop was still in progress.

Defendant also argues that his consent was not voluntary. A defendant's consent to search must be knowingly and voluntarily given. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973). Voluntariness is a question of fact that is determined from the totality of the circumstances. *Ohio v. Robinette*, 519 U.S. 33, 40 (1996) (internal citation omitted). To assess voluntariness, courts consider: "(1) whether the defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the defendant was notified he had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained." *United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir.2002), *citing United States v. Castillo*, 886 F.2d 1071, 1082 (9th Cir.1989).

Here, Defendant was not in custody. In fact, DPS officers told him he would be free to leave after they returned his firearm to him. Furthermore, after Officer Galarneau asked for verbal consent to search the truck and received that consent from Defendant, he asked Defendant to sign a written consent form. The "dash-cam" video shows Defendant briefly glanced at the form and signed it. Observing Defendant's quick signature, Officer Galarneau asked Defendant if he read the form and if he understood everything. The video shows Defendant reads the form for a longer period of time and then tells Officer Galarneau that he does understand it. The totality of all the circumstances show that Defendant voluntarily consented to the search of his truck. The Magistrate Judge recommends that Defendant's motion to suppress evidence be denied.

**MOTION TO SUPPRESS STATEMENT**

Defendant argues all statements he made to law enforcement officers during the traffic stop of his vehicle should be suppressed because he was "in custody" for the purposes of *Miranda* and he was never advised of his *Miranda* rights while stopped along the interstate. The Government contests Defendant's motion, arguing Defendant was not in custody from the initiation of the traffic stop through the consensual search with the canine of Defendant's truck.

The Fifth Amendment requires that a suspect who is in custody be properly advised of his rights before being interrogated by law enforcement. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The prosecution may not use any statements "whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id*. A person is considered "in custody" for purposes of *Miranda* if the person is "deprived of his freedom of action in any significant way." *Id*. Courts first consider the totality of the circumstances to determine if a defendant was subject to custodial interrogation. *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). Courts then apply "an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id*. (internal citations omitted). Detaining a person for an

ordinary traffic stop is not "in custody" for the purposes of *Miranda*. *Berkemer v. McCarty*, 468 U.S. 420, 438-440 (1984).

The initial stop of Defendant was a traffic stop and Defendant was not in custody as he exited his truck and talked with DPS officers in front of Officer Galarneau's patrol vehicle. Defendant was also not in custody during the canine search of his truck. Defendant voluntarily consented to that search. He read and signed the consent form which informed him that he could withdraw his consent to search at any time. Officers were not obligated to advise Defendant of his *Miranda* rights at any point during the first approximately fifty-six minutes of the stop. The Magistrate Judge recommends that Defendant's motion to suppress any statements he gave during that time frame be denied.

There did, however, come a time when Defendant was in custody for purposes of *Miranda*. After Officer Galarneau's canine alerted to Defendant's truck, Officer Galarneau placed Defendant in the back of a patrol vehicle. At that point, Defendant was deprived of his freedom of action in a way associated with a formal arrest and he should have been read his *Miranda* rights before he was interrogated by officers. Defendant was not advised of his *Miranda* rights until 1:20 a.m., nearly two hours after he was placed in the back of an officer's patrol vehicle. Based on the audio from the "dash-cam", Officer Galarneau interrogated Defendant about some of the inconsistencies in his story for at least a few minutes shortly after the canine search of Defendant's truck. Any statements Defendant gave to law enforcement officers after he was placed in the back of the patrol vehicle and before he was advised of his *Miranda* rights two hours later should be suppressed. The Magistrate Judge recommends that Defendant's motion to suppress statements be granted in part, as to any statements officers elicited through interrogation between the time Defendant was placed in the patrol vehicle to the time he was *Mirandized*.

**RECOMMENDATION**

For the reasons outlined above, the Magistrate Judge recommends that the District Court, after its independent review, DENY Defendant's Motion to Suppress Evidence (Doc 20) and DENY IN PART and GRANT IN PART Defendant's Motion to Suppress Statements

(Doc 21).

Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and file written objections within ten days of being served with a copy of the Report and Recommendation. If objections are not timely filed, they may be deemed waived. The parties are advised that any objections filed are to be identified with the following case number: **CR 08-1253-FRZ**.

DATED this 22nd day of October, 2009.

CHARLES R. PYLE
UNITED STATES MAGISTRATE JUDGE